UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROBERT W. GORDON,

                Plaintiff,

      -against-

WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, RORY L. LUBIN, STUART MILLER, and JOHN and JANE DOE (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

                Defendants.
------------------------------------------------------------X

Docket No.:

**COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff, **ROBERT W. GORDON** ("Gordon"), by his attorneys, **MADUEGBUNA COOPER LLP**, for his complaint alleges:

### I.    THE NATURE OF THIS ACTION

1. Gordon, an accomplished and thoughtful litigator, was terminated because his employer, a large civil defense law firm and his supervisors, did not want to deal with his disabilities or provide him reasonable accommodations that the law required.

2. In 2016, Gordon began working at the large defense firm with offices across the country.

3. In 2018, despite his legal skills and competence, Gordon requested reasonable accommodations from Defendants due to a cognitive impairment.

4. Defendants requested medical testing and documentation, which Gordon and his doctors provided in late 2018 in support of his request for reasonable accommodations.

5. However, Defendants never granted Gordon any reasonable accommodations or requested more medical support, failed to implement the reasonable accommodations

recommended by doctors, and refused to further engage in the interactive process.

6. Without the reasonable accommodations, Gordon was forced to continue working without his medically necessary accommodation that would have cost next to nothing for Defendants to provide.

7. As the months went by, Defendants never gave Gordon any good-faith written notice or warning that he needed to improve his performance. And he was praised for his work.

8. In January 2022, Gordon's attempted to switch litigation teams to accommodate his medically documented disabilities, a request that was immediately rejected.

9. On February 1, 2022, Defendants terminated Gordon after falsely claiming that he had performance issues and would never change.

10. In reality, Defendants did not want to provide Gordon his reasonable accommodations or deal with his disability.

11. In doing so, Defendants broke the law and will put others at risk if they are not forced to change their treatment of disabled employees.

12. To remedy these violations and prevent future harm, Gordon brings this action for injunctive relief, declaratory judgment and money damages to remedy discrimination on the basis of disability under the New York State Human Rights Law as contained in New York State Executive Law, § 296, *et seq.* ("NYSHRL"); New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107, *et seq.* ("NYCHRL"); and for interfering with Gordon's rights under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq.* (the "FMLA").[1]

13. Gordon also sues for breach of contract under New York State law.

14. Gordon contends that the terms, conditions and privileges of his employment relationship with his employer were adversely affected because of his disability.

## II. JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

16. This Court has supplemental jurisdiction over the state causes of action pleaded.

17. Venue is proper in this district under 28 U.S.C. § 1391(b) because the underlying events took place in this district.

## III. PROCEDURAL REQUIREMENTS

18. After commencing this action, Plaintiff will serve a copy of the complaint upon the New York City Commission of Human Rights and the Corporation Counsel of the City of New York, in accordance with New York City Administrative Code Section 8-502(c).

## IV. PARTIES

19. Plaintiff Gordon is a 52-year-old African American male.

20. Gordon is a resident of Westchester County and the State of New York.

21. Since 2005, Gordon has been an attorney in good standing admitted to practice law in New York State.

22. In 2004, Gordon received his law degree from New York University ("NYU") School of Law.

23. Gordon received his bachelor's degree from Morehouse College in 1993, graduating in the top 5% of his class.

---

[1] Plaintiff filed a charge with the Equal Employment Opportunity Commission under the Americans with Disabilities Act and will file an amended complaint after receiving the required Right to Sue letter.

24. At all times relevant, Gordon was employed by the law office of Defendant WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP ("WILSON ELSER").

25. At all times relevant, Gordon worked from the WILSON ELSER office located at 1133 Westchester Avenue, White Plains, NY 10604.

26. At all times relevant, Gordon also worked from the WILSON ELSER principal office located at 150 East 42nd Street, New York, NY 10017.

27. At all times relevant, Gordon made appearances as the attorney of record on cases filed in courts within New York City.

28. At all times relevant, over 90% of Gordon's cases were filed in courts within New York City.

29. WILSON ELSER is a law firm with over 900 attorneys as employees and/or employee-owners and has 41 offices throughout the United States.

30. WILSON ELSER is a Domestic Limited Liability Partnership registered in the State of New York.

31. WILSON ELSER filed as a Domestic Limited Liability Partnership with the New York State Department of State on February 26, 1998 with effective date of March 2, 1998.

32. WILSON ELSER has its principal executive office address at the Socony-Mobil Building, 150 East 42nd Street, New York, NY 10017.

33. WILSON ELSER designated its registered agent for service in New York as "CT CORPORATION SYSTEM" located at 28 Liberty Street, New York, NY 10005.

34. At all times relevant Defendant RORY L. LUBIN ("LUBIN") was a contract partner and then an equity partner at WILSON ELSER.

35. At all relevant times, LUBIN was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices.

36. LUBIN, as an equity partner, has an "ownership interest" in WILSON ELSER for all purposes plead.

37. LUBIN had the power to hire and or fire employees of WILSON ELSER.

38. LUBIN is sued in his personal capacity for monetary damages and in his official capacity for injunctive relief.

39. At all relevant times, LUBIN had authority to assign duties and responsibilities to employees; supervised and controlled employee work schedules and conditions of employment; and possessed authority to promote, demote, assign responsibilities and, if necessary, terminate employees.

40. At all times relevant, Defendant STUART MILLER ("MILLER") was an equity partner at WILSON ELSER.

41. At all relevant times, MILLER was responsible for ensuring that employees are not subjected to discriminatory or retaliatory practices.

42. MILLER, as an equity partner, has an "ownership interest" in WILSON ELSER for all purposes plead.

43. MILLER is the head of the practice group at WILSON ELSER under which Gordon and LUBIN worked.

44. MILLER's group is reputed to be the largest revenue producing group for WILSON ELSER nationwide.

45. MILLER had the power to hire and or fire employees of WILSON ELSER.

46. MILLER is sued in his personal capacity for monetary damages and in his official capacity for injunctive relief.

47. At all relevant times, MILLER had authority to assign duties and responsibilities to employees; supervised and controlled employee work schedules and conditions of employment; and possessed authority to promote, demote, assign responsibilities and, if necessary, terminate employees.

48. At all relevant times, Defendants aided and abetted the discriminatory acts of each other taken against Gordon.

V. **FACTS COMMON TO ALL CAUSES OF ACTION**

*Gordon's Legal Experience*:

49. Before joining WILSON ELSER, Gordon had over 12 years of civil defense litigation experience with the New York City Law Department ("Law Department").

50. Gordon spent, *inter alia*, four years in the Special Litigation Unit and three years as a back-to-back trial attorney in Bronx County.

51. The Special Litigation Unit handles some of the highest profile, high exposure injury cases in the City of New York.

52. Gordon handled cases involving catastrophic injuries and involved damages typically over $1 million dollars and at times valued over $10 million dollars.

53. Gordon handled these high exposure cases with minimal supervision from inception to trial.

54. As a trial attorney in Bronx County, Gordon tried cases valued upwards of $40 million dollars.

55. Gordon prepared upwards of 36 cases for trial and took at least seven trials to

verdict.

56. Gordon also won cases on summary judgment valued at upwards of $10 million and received departmental awards.

*Gordon's Employment with WILSON ELSER*:

57. On or about August 16, 2016, Gordon started his employment with WILSON ELSER as "Of Counsel."

58. His work involved all aspects of civil defense litigation in both the state and federal courts of the state of New York.

59. Gordon was interviewed by and hired by MILLER.

60. From 2016 to his termination in 2022, Gordon was supervised by LUBIN.

61. MILLER never introduced Gordon to LUBIN before he started working for WILSON ELSER.

62. Unknown to Gordon, several attorneys had left WILSON ELSER to avoid working for LUBIN.

63. At WILSON ELSER, Gordon worked on cases that were less complicated and had less exposure than the cases he handled by himself at the Law Department.

64. Despite Gordon's experience and qualifications, LUBIN had final say over Gordon's cases and directly oversaw his legal work.

65. During his first year, LUBIN mostly assigned Gordon paralegal level work.

*Defendants Knew About Gordon's Disability and Need for Reasonable Accommodation*:

66. At all relevant times, Gordon was disabled and was regarded by Defendants as disabled.

67. Defendants knew that Gordon's disabilities impacted his ability to work as an

attorney under certain types of situations.

68. As part of his employment contract, Gordon was never required to meet any minimum number of billable hours. He never received, to his knowledge, any written billing requirement or goal.

69. In early 2018, LUBIN approached Gordon about his billable hours.

70. In response, Gordon told LUBIN he had developed physical and mental impairments due to prescription medications and traumatic life events that pre-dated the start of his employment with WILSON ELSER.

71. Gordon told LUBIN that such impairments affected his ability to perform legal work under certain conditions.

72. Gordon told MILLER similar information in 2018.

73. The impairments were "disabilities" because they substantially limited a major life activity by interfering with Gordon's ability to read, concentrate, think, communicate, and work.

74. Gordon's disabilities interfered with his work on an hourly and daily basis.

75. Despite his disabilities, Gordon managed to excel at work, was able to perform the essential duties of his position and received praise for his work from LUBIN and MILLER.

76. However, Gordon's disability was always and constantly affecting him in the background.

77. In 2018, Human Resources and LUBIN asked Gordon to submit to medical examination to confirm his disability.

78. LUBIN followed up several times asking Gordon when he would get examined.

79. In 2018, Gordon requested reasonable accommodations from WILSON ELSER.

80. Gordon's request was primarily handled by Margaret Luberda ("Luberda"), then Chief Human Resources Officer for WILSON ELSER.

81. On or about April 10, 2018, Luberda asked Gordon to provide contact information for doctor(s) to request medical information concerning his request for reasonable work accommodations.

82. On or about April 10, 2018, Gordon provided the contact information for his neurologist, Dr. Jeffrey O. Berman, M.D.

83. On or about August 24, 2018, Gordon visited Dr. Berman in regard to the above conditions affecting his work and was referred to a clinical neuropsychologist, Dr. Robert J. Dunkle, Ph.D.

84. On September 18, 2018, Gordon visited Dr. Dunkle for further consultation in regard to the conditions affecting his work.

85. On or about October 16, 2018, Luberda requested that Gordon provide an authorization allowing WILSON ELSER to communicate with Dr. Dunkle.

86. On or about October 16, 2018, Gordon signed an authorization allowing WILSON ELSER to communicate with Dr. Dunkle regarding his request for a reasonable accommodation.

87. On or about October 22, 2018, Gordon began three days of neuropsychological testing with Dr. Dunkle.

88. On or about October 23, 2018, Luberda sent a two-page letter questionnaire to Dr. Dunkle concerning Gordon's request for reasonable accommodations.

89. On or about November 8, 2018, Dr. Dunkle returned to Luberda a three-page response to WILSON ELSER'S questionnaire, specifically sent to Luberda as Chief Human

Resource Officer.

90. On or shortly after November 8, 2018, Defendants received that 3-page report from Dr. Dunkle that diagnosed Gordon with a disability, described his neurological diagnosis as "Acute Stress Disorder" (ICD 10-F43.0) and listed six workplace accommodations deemed "crucial" for Gordon to perform his legal work.

*Defendants Failed to Accommodate Gordon's Disability*:

91. After receiving the report from Dr. Dunkle, Defendants did not contact Gordon regarding his request for a reasonable accommodation and did not engage in the interactive process.

92. After receiving a plausible list of accommodations, Defendants failed to demonstrate that the requests would present undue hardships for WILSON ELSER.

93. Prior to February 1, 2022, Defendants never granted the reasonable accommodations for Gordon as recommended by Dr. Dunkle or requested that Gordon submit to any other examinations.

94. Although LUBIN requested that Gordon be tested, LUBIN never engaged in the interactive process with Gordon or responded to his requests for a reasonable accommodation after the test results were submitted to WILSON ELSER.

95. LUBIN never requested that Gordon submit to further testing or provide any additional medical documentation.

96. As a result, Defendants were responsible for the breakdown in the interactive process.

97. Gordon continued to suffer from the disabilities and conditions Dr. Dunkle diagnosed.

98. After WILSON ELSER received Dr. Dunkle's report, Gordon continued to suffer due to the lack of accommodations as identified by Dr. Dunkle until his termination on February 1, 2022.

99. Gordon's disabilities and conditions as confirmed by Dr. Dunkle substantially limited and affected his ability to perform a wide range of his job functions.

*Defendants Unlawfully Terminated Gordon*:

100. As Defendants knew, LUBIN'S litigation and management style aggravated Gordon's disabilities that were going unaccommodated. Worse, LUBIN's approach went against many of Dr. Dunkle's specific recommendations.

101. The combination of no accommodations and LUBIN's approach impeded Gordon.

102. On or about January 27, 2022, Gordon emailed MILLER requesting to be removed from LUBIN's team and, as one option, do more appellate work to boost his billable hours and perform the type of work that Dr. Dunkle recommended as an accommodation.

103. Gordon made the transfer request based on Defendants' continued failure to provide reasonable accommodations.

104. Appellate work, for example, was in line with the type of accommodations that Dr. Dunkle recommended, like working on an assignment for a sustained period without interruptions.

105. Minutes later, MILLER denied Gordon's request.

106. Despite knowing of Gordon's disabilities, MILLER's refusal was without exploring Gordon's need for a reasonable accommodation that Defendants never granted.

107. MILLER's immediate denial showed that further attempts to speak with him would have been futile.

108. On February 1, 2022 at 9:27 AM, five days later, LUBIN emailed Gordon stating: "Let's speak by phone today at 3 p.m. to run through our cases together. I will call you. What's the best number to use?"

109. Gordon, who was working remotely due to COVID, requested to speak at 3:30 p.m. instead.

110. Based on LUBIN'S case review request, Gordon spent several hours preparing case updates.

111. At about 3:30 p.m., LUBIN, in an unusually chipper tone, called Gordon with Jennifer Des Armo, Chief Human Resource Officer, on the line.

112. LUBIN terminated Gordon and instructed him to stop all work on his cases.

113. LUBIN claimed that Gordon was terminated because of performance issues and because "we believe you will never change" and turned the call over to Des Armo, who he said would be Gordon's only contact going forward.

114. Once Des Armo finished, LUBIN said in a sarcastic tone "So long" and hung up.

115. LUBIN never discussed any of Gordon's cases on the aforementioned telephone call as LUBIN had originally purported the telephone call would be about.

116. Upon information and belief, LUBIN would not have terminated Gordon without MILLER's participation and approval.

117. Defendants failed to engage in the interactive process to accommodate Gordon before terminating him despite knowledge of his disability and prior requests for accommodations.

118. Pursuant to his contract with WILSON ELSER, Gordon was required to be given 30-days' written notice prior to termination.

119. In breach of his contract, Gordon was never given written notice of his termination.

120. Despite LUBIN's false claims about performance issues, LUBIN had never provided Gordon with any formal written performance evaluations or reviews during his six-year employment.

121. No one at WILSON ELSER had ever shared with Gordon any documentation of performance issues prior to his termination.

122. Defendants never warned Gordon directly or in good-faith that he could be terminated due to performance issues or that he needed to improve his performance.

123. Instead, LUBIN and MILLER terminated Gordon due to his disabilities and need for reasonable accommodations and devised the "performance issues" as a pretext.

124. Due to his termination, Gordon was prevented from working in New York City and handling cases filed in New York City, where over 90% of his cases were located.

125. Upon information and belief, the attorneys who assumed Gordon's work or replaced him did not have disabilities or require reasonable accommodations.

*Defendants' Actions Continue to Cause Gordon Loss and Damage*:

126. As a proximate result of Defendants' discriminatory conduct, Gordon has suffered and continues to suffer significant monetary loss and damages, including the loss of past and future earnings, and other employment benefits.

127. As a further proximate result of Defendants' actions, Gordon has suffered emotional distress, lasting embarrassment, humiliation and anguish, as well as other incidental and consequential damages and expenses.

128. Defendants' conduct was outrageous and malicious, intended to injure Gordon, and carried out with reckless indifference to Gordon's protected civil rights, thereby entitling him to punitive damages.

**FIRST COUNT AGAINST ALL DEFENDANTS**
**(Interference with Rights under the FMLA)**

129. Plaintiff repeats and realleges each allegation in each paragraph above.

130. Plaintiff is an "employee" as defined under the FMLA and was eligible to take FMLA leave.

131. Defendants WILSON ELSER, LUBIN, and MILLER, are each an "employer" under the FMLA.

132. As a direct and proximate result of Defendants' conduct alleged, Gordon's rights were interfered with and denied in violation of the FMLA.

133. Defendants interfered with Gordon's rights under the FMLA because they knew of his medical condition and diagnosis and failed to advise him of his rights to take medical leave prior to his unlawful termination.

134. Defendants unlawfully interfered with Gordon's FMLA rights by failing to advise him of his rights and failed to inquire whether Gordon's medical condition was a qualifying "serious health condition" under the FMLA for leave or intermittent leave at the time of his termination.

135. As a result of Defendants unlawfully interfering with Plaintiff's rights under the FMLA and discriminating against him on the basis of disability, Gordon continued to experience the impacts of his disability and was terminated.

136. As a result, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**SECOND COUNT AGAINST ALL DEFENDANTS**
**(Disability Discrimination in Violation of the NYSHRL)**

137. Plaintiff repeats and realleges each allegation in each paragraph above.

138. At all relevant times, Gordon was an "employee" within the meaning of the NYSHRL.

139. At all relevant times, WILSON ELSER, LUBIN, and MILLER were "employers" within the meaning of the NYSHRL.

140. On the basis of his disability, Defendants discriminated against in violation of the NYSHRL by (i) failing to provide Gordon reasonable accommodations for his disabilities, and (ii) terminating Plaintiff's employment because of his disabilities.

141. By reason of the foregoing, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

**THIRD COUNT AGAINST ALL DEFENDANTS**
**(Disability Discrimination in Violation of the NYCHRL)**

142. Plaintiff repeats and realleges each allegation in each paragraph above.

143. At all relevant times, WILSON ELSER, LUBIN, and MILLER were "employers" within the meaning of the NYCHRL.

144. On the basis of his disability, Defendants discriminated against in violation of the NYCHRL by (i) failing to engage in a cooperative dialogue about his need for an accommodation

within a reasonable, (ii) failing to provide Gordon reasonable accommodations for his disabilities, and (iii) terminating Plaintiff's employment because of his disabilities.

145. As a result, Plaintiff suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

### FOURTH COUNT AGAINST DEFENDANT WILSON ELSER
#### (Breach of Contract)

146. Plaintiff repeats and realleges each allegation in each paragraph above.

147. Gordon has a written employment contract with WILSON ELSER.

148. The contract terms required 30 days written notice of any intention of the employer to terminate Gordon's employment with WILSON ELSER.

149. WILSON ELSER breached the contract because it never provided Gordon written notice of his termination.

150. As a result, Plaintiff has suffered loss and damage in an amount to be determined at trial but estimated to be no less than $100,000.00.

### PUNITIVE DAMAGES

151. Gordon claims punitive damages by reason of Defendants' wanton, unrepentant, reckless and egregious conduct alleged.

**WHEREFORE,** Plaintiff prays that this Court grant him judgment containing the following relief:

a. Impanel a jury to hear Gordon's claims;

b. Requiring Defendants to implement a policy to provide assess and provide reasonable accommodations consistent with the law, and to require training of such policies and laws to all supervisors and human resource employees on an

annual basis;

c. An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for his monetary loss and damages, including but not limited to Plaintiff's loss of past and future earnings, bonuses, compensation, and other employment benefits;

d. An award of damages to compensate Plaintiff for mental anguish, humiliation, embarrassment, and emotional injury for each cause of action;

e. An award of damages in an amount to be determined upon the trial of this matter to compensate Plaintiff for violations of his rights under the NYSHRL, NYCHRL, and FMLA;

f. An award of punitive damages to be determined at the time of trial for the claims under the NYSHRL and NYCHRL;

g. Liquated damages under the FMLA;

h. An award of reasonable attorney's fees and costs related to Plaintiff's claims under the NYSHRL, NYCHRL and the FMLA; and,

i. Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
      June 21, 2022

Respectfully Submitted,

_____
SAMUEL O. MADUEGBUNA, ESQ.
**MADUEGBUNA COOPER LLP**
Attorneys for Plaintiff,
ROBERT GORDON
30 Wall Street, 8th Floor
New York, NY 10005
(212) 232-0155

TO:    Defendants

    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    150 East 42nd Street,
    New York, NY 10017

    RORY L. LUBIN
    c/o WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    1133 Westchester Avenue
    White Plains, NY 10604

    STUART MILLER
    c/o WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    150 East 42nd Street,
    New York, NY 10017

    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    c/o CT CORPORATION SYSTEM
    28 Liberty Street
    New York, NY 10005